# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO
_____

MICHAEL CATAPANO,

      Plaintiff,

    v.                                                Civil No. 14-811 WJ/SCY

CELLCO PARTNERSHIP INC.
d/b/a Verizon Wireless, et al.,

      Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon Defendant's Motion for Summary Judgment, filed September 18, 2015 (**Doc. 42**).   Having reviewed the parties' briefs and applicable law, the Court finds that Defendant's motion is well-taken and, accordingly, is granted.

## BACKGROUND

In this case, Plaintiff, a white Italian male, sues his former employer Verizon Wireless ("Verizon"). He alleges that he was subjected to discriminatory, harassing and retaliatory treatment by Defendant and its managers, supervisors and employees and was terminated from employment based on discriminatory and retaliatory reasons and in violation of an implied contract between the parties.  Defendant contends that any actions taken toward Plaintiff were based on non-discriminatory and non-retaliatory reasons, specifically, that it terminated Plaintiff's employment because Plaintiff violated Defendant's workplace violence policy while he was on a Final Written Warning.

Plaintiff filed his Complaint on July 30, 2014 in the Second Judicial District Court for the State of New Mexico, County of Bernalillo.  Defendant removed the case to federal court on September 5, 2014 under federal question jurisdiction based on Count VII which asserts a claim under the Family and Medical Leave Act, 29 U.S.C. §2615(a), pursuant to 28 U.S.C. § 1331 and §1441.[1]  Plaintiff asserts the following claims:

| | |
|---|---|
| Count I: | Retaliatory Wrongful Discharge; |
| Count II: | Race Discrimination under the New Mexico Human Rights Act ("Human Rights Act"); |
| Count III: | Gender Discrimination (male) under the Human Rights Act;[2] |
| Count IV: | Retaliation under the Human Rights Act; |
| Count V: | Breach of Implied Contract; |
| Count VI: | Assault; |
| Count VII: | Retaliation under the Family and Medical Leave Act; |
| Count VIII: | Negligent Hiring, Retention and Supervision |

Defendant moves for summary judgment on all of Plaintiff's causes of action.

## I.    Legal Standard

Pursuant to Rule 56, a party is entitled to summary judgment if it can establish "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007). Only disputes of material fact "preclude the entry of summary judgment." *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1111 (10th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  If the moving party meets its burden, "the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for

---

[1]  The removal was made by Verizon and Defendant Jacqueline Biesterveld ("Biesterveld"), who was Plaintiff's former supervisor, but Plaintiff voluntarily dismissed Biesterveld from the case after removal. Doc. 21.

[2]  Plaintiff has advised Defendant that he is withdrawing his gender-based harassment claim. *See* Doc. 42 at 1, n.1.

the nonmovant." *Herrera*, 506 F.3d at 1309 (citation and internal quotation marks omitted). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and thus, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The Court "examine[s] the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Cohen-Esrey Real Estate Servs., Inc. v. Twin City Fire Ins. Co*., 636 F.3d 1300, 1302 (10th Cir. 2011). "The construction of an insurance policy is a matter of law." *Grimes v. Swaim*, 971 F.2d 622, 624 (10th Cir.1992) (citation and internal quotation marks omitted).

## II.    Facts[3]

Plaintiff began his employment with Verizon Wireless on January 19, 2010 as a Customer Service Representative at the company's Albuquerque Call Center.   During his employment, Plaintiff read Verizon's Code of Conduct regarding Verizon's expectations for employee conduct, and was also familiar with the company's workplace violence policy, which essentially sets forth Verizon's no-tolerance policy for any "threatening, hostile or abusive behavior in the workplace."   Ex. C-1. Under that policy, Verizon stated that it "will take immediate and appropriate action against offenders, up to and including termination of employment and referral for criminal prosecution." *Id.*

During the thirteen months that he worked in this position, Plaintiff did not feel that he was harassed, discriminated against, or retaliated against in any way.

---

[3]   Defendant presents ten categories consisting of 109 facts, starting from the details of Plaintiff's employment with Verizon and ending with those related to his termination. The Court presents the factual background in narrative form based on a summary of the undisputed facts, unless otherwise noted.  The Court has also incorporated Plaintiff's "Undisputed Material Facts" (Doc. 44 at 5-9) into the factual narrative.  None of these facts create a material issue of fact on any of the issues.  Also, supportive exhibits are cited in the briefs and will not be referenced here except where necessary.

A.     Facts Regarding Biesterveld's Pronunciation of Plaintiff's Last Name

Plaintiff's allegations begin just after Plaintiff was promoted to a Tech Support I position on February 27, 2011.  Jacqueline Biesterveld ("Biesterveld"), a Hispanic-American female, was Plaintiff's first supervisor in that position, until January 2012. Plaintiff had no discrimination concerns about Biesterveld during this time period.  Biesterveld also supervised Plaintiff from December 31, 2012 to July 1, 2013.   During this six-month period, Plaintiff claims that Biesterveld failed to stop a coworker from harassing and intimidating him, issued him a Final Written Warning in retaliation for him voicing complaints about his coworker, and called him by his last name in a mocking manner overemphasizing the syllables in his name.

Plaintiff also reported to Christopher Bassett, a white male, from July 1, 2013 until his employment terminated on October 26, 2013 for violating Verizon's workplace violence policy. Plaintiff asserts no allegations in this lawsuit against Mr. Bassett.

B.     Complaints of Co-Worker Harassment

The co-worker with whom Plaintiff was having problems was Searcy Dixon ("Dixon"), an African-American male, who had recently transferred onto Biesterveld's team.   In mid-January 2013, Plaintiff reported to Biesterveld that Dixon was displaying confrontational and aggressive body language toward him.   Specifically, Plaintiff claimed that Dixon continuously stood in front of his work station, glared at him, and threw punches in the air in his direction (i.e., shadow boxing).  Plaintiff told Biesterveld that he suspected that Dixon's actions were motivated by Catapano's age, race or ethnicity. Biesterveld reported Plaintiff's complaint to Human Resources ("HR") and advised Plaintiff on February 4, 2013 that she was working with HR to resolve the matter.   Biesterveld also told Plaintiff that she would continue to observe Dixon's

4

behavior and that she would follow-up with him daily to make sure he was okay, and Plaintiff recalls Biesterveld doing so.

In mid-February 2013, Plaintiff e-mailed Biesterveld to complain about Dixon.  He advised Biesterveld that Dixon was assigned to listening to calls that day to learn how to properly assist customers resolve their service issues.  Dixon asked to listen to one of Plaintiff's calls, but Plaintiff did not permit Dixon to listen to one of his calls.  Plaintiff claimed that after he declined Dixon's offer to listen to his calls, Dixon called him a "jerk" to other members of the team and started laughing.  This is the only instance during Plaintiff's employment that he complained about any comments made by Dixon.  Plaintiff also stated in a February 2013 e-mail to Biesterveld that when he glanced up periodically that same day, he saw Dixon glaring at him while sitting in on other calls.  Plaintiff interpreted Dixon's glaring at him as an attempt to intimidate him.

Biesterveld immediately forwarded these concerns to her supervisor, who in turn contacted Human Resources Consultant Robyn Lumb ("Lumb") to meet with Plaintiff in order to discuss his concerns.  During Lumb's conversation with Plaintiff on February 18, 2013, Plaintiff admitted that he had never had a conversation or personal interaction with Dixon.  Lumb learned from Dixon's previous supervisor, Joe Acosta ("Acosta"), that Dixon often celebrates his customer upgrades, accessories, and good calls by putting his fist up in the air as a victorious gesture. Acosta also relayed that no other employees had ever expressed concerns about Dixon's behavior and that Dixon often expresses excitement and charges up the team in this way.[4] Plaintiff "disputes" these facts by insisting that Dixon's gestures were done "in a very aggressive

---

[4]   Dixon's air punching was observed by David Sanchez from Human Resources, who stated: "I saw Searcy [Dixon] do this.  He seemed to do this when he got excited on a call.  I could tell that they [Plaintiff and Dixon] never really interacted." Ex. C-7.

hostile manner" and that he could not interpret those mannerisms "as a celebration." Ex. 1 at 126-127. Plaintiff's interpretation of Dixon's conduct, however, does not create a factual dispute regarding Acosta's statements which explain Acosta's understanding of Dixon's behavior.

Lumb offered to transfer Plaintiff to another team, but Plaintiff told Lumb he wanted to be moved to another *position* for which he had interviewed in the past, but which was unavailable because it had no funding at that time. Ex. A at 50:15-25. In an e-mail to Plaintiff, Lumb clarified that their discussion had been limited to a transfer to another team and that she would not be able to move him to another position. Plaintiff responded by e-mail stating: Thank you for your quick response, and for clarification." Ex. B. Plaintiff claims that his "understanding" at that point was that Lumb would continue to consider transferring him to another team. Ex. A at 51:1-22. Lumb stated that she offered to move Plaintiff to another team, but that Plaintiff never took her up "on the offer." Ex. B, ¶ 11. She told Plaintiff that in order to be transferred to another position, he would have to go through the interview process. *Id.* Lumb closed out her investigation on this matter on February 19, 2013. Plaintiff did not respond to Lumb's offer about a transfer until after the investigation was closed. He sent an email to Lumb on March 18, 2013 renewing his interest in transfer to another team, stating that Dixon had stopped threatening him, but felt that "he could potentially become violent at any time." Pltff's Ex. 35 (Doc. 44-2).

### C.   Alleged Discriminatory Treatment After Being Issued Final Written Warning

On June 27, 2013, Plaintiff received a Final Written Warning ("Warning") for customer abuse in violation of the Company's Code of Conduct. The Warning was issued after a customer complained that Plaintiff had been abusive and rude during a call. Upon review of the call, it was discovered that Plaintiff had transferred a customer to the Spanish Technical Support queue

even though the customer had told him that he did not speak Spanish.  Ex. B-5; Ex. D, ¶ 10.
When Biesterveld delivered the Warning to Plaintiff, Plaintiff responded that he felt the customer
was the one who was abusive and rude.

On June 28, 2013, the day after he received the Warning, Plaintiff sent an e-mail to Lumb
asking to set up an appointment to discuss issues related to threats that he allegedly received
from Dixon while he was on Biesterveld's team.  He also alleged that Biesterveld had issued the
Warning to retaliate against his previous complaints to Lumb reporting threats of violence
against him and that Biesterveld had singled him out for discriminatory and hostile treatment
based on his race or ethnicity.  Lumb advised Plaintiff to speak with David Sanchez ("Sanchez")
from HR about these complaints.[5]  On July 1, 2013, Plaintiff contacted Sanchez to let him know
he was preparing a letter detailing his concerns about Biesterveld's alleged retaliation. Plaintiff
also advised Sanchez that he was experiencing some medical issues that were going to require
him to go out on short term disability.  Sanchez responded the same day, providing Plaintiff
information about short term disability benefits and confirming that he would promptly look into
Plaintiff's concerns.

Plaintiff was on an approved leave of absence from July 15, 2013 through August 11,
2013.

D.  Investigation into Plaintiff's Complaints

On July 15, 2013 (the first day of Plaintiff's leave), Plaintiff sent Sanchez his list of
complaints: that he was threatened for several months by Dixon; that Biesterveld and Lumb
retaliated against him for his prior complaint about Dixon's behavior; that Biesterveld exhibited
racism and bigotry by calling him by his last name while she allegedly addressed everyone on

---

[5]  David Sanchez was the HR consultant for Plaintiff's new team when Plaintiff stopped reporting to Biesterveld on
July 2013.  However, it is not clear exactly when Plaintiff was moved to a new team.

the team by their first name.  In that complaint, Plaintiff alleged for the first time that he was denied promotions because of discriminatory reasons.

Sanchez conducted an investigation promptly, learning that Biesterveld in fact alternated between first and last names for all of the employees on her team. Even though there was no evidence that Biesterveld treated Plaintiff any differently than the other employees on her team, Sanchez coached Biesterveld to remember to be consistent in the way she addressed her employees.  On this claim against Biesterveld, it should be noted that Plaintiff concedes that Biesterveld addressed other white employees by their last name, and that while Biesterveld did not make any derogatory comments about Italian Americans, she would address Caucasians by their last names and Hispanics and African Americans by their first names. Ex. A at 25-26.[6]

Sanchez' investigation did not reveal any evidence supporting Plaintiff's allegation that he had discriminatorily been denied promotional opportunities.  When Sanchez asked him why he felt he was discriminated against when he did not get the positions, Plaintiff stated, "it was just a feeling."  Plaintiff does not dispute that he said this, but claims that it was "taken out of context" and adds that as he applied for "more and more jobs, I began to get a feeling that something was wrong . . . because I had been denied so many opportunities for career advancement. . . ."  Ex. A at 79:17-25. Sanchez told Plaintiff that he found his claims of retaliation were not substantiated.  Sanchez closed out the investigation on August 28, 2013 but asked Plaintiff to bring any additional concerns to his attention.  Plaintiff's complaints continued in September, when Plaintiff e-mailed Sanchez complaining that Biesterveld was regularly

---

[6]  The basis for Plaintiff's discrimination claim here is not altogether clear.  At best the Court can discern, Plaintiff equates being called by his surname with racism.  However, since he and other Caucasian males do not belong to a protected class, he is actually alleging a reverse discrimination claim in which he must show that this defendant is "one of those unusual employers who discriminates against the majority."  *See Argo v. Blue Cross & Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1201 (10th Cir. 2006).  Plaintiff does not allege such a claim, nor would there be any basis to such allegations, given the undisputed facts.

visiting his workstation and was making a point of calling everyone by their first name but continued to address him by his last name.   He also complained that Dixon was standing up at his workstation and glaring at him (Plaintiff) for long periods of time.   Plaintiff's theory was that Biesterveld was soliciting Dixon to threaten and harass him as a form of "racist intimidation." Ex. C at ¶18, & Ex. C-13.   Sanchez addressed Plaintiff's concerns.   He met with Biesterveld and instructed her to avoid being around Plaintiff's desk unless she had a business reason, and to make sure she was not around Plaintiff's desk without a business reason.   Sanchez met with Plaintiff again on September 23rd and advised him that Associate Director Mitchell Glen ("Glen") was aware of the situation and would be keeping he eye on the area.

     E.     <u>Facts Regarding Verbal Altercation with Dixon and Termination</u>

The situation that precipitated Plaintiff's termination occurred on the night of October 3, 2013 while Plaintiff was on the phone assisting a customer with a technical issue.   According to several witnesses, Plaintiff began yelling at Dixon, taunting him to "try it again."   Ex. A at 165:24-25; Ex. C at ¶30; Ex. E at ¶30 & Ex. E-1.   A coworker immediately notified Acosta about the situation.   Acosta approached Plaintiff and Dixon, at which point Plaintiff slammed his headset down, pointed his finger in Dixon's face, and yelled "try it again" at Dixon. Ex. E at ¶ 3 and Ex. E-1.   Dixon began backing away with his hands raised and a look of surprise on his face, and repeatedly stated that he did not know what Plaintiff was talking about. Plaintiff continued to yell questions at Dixon without putting his customer on hold, and so the customer was listening to the entire situation.

Acosta alerted Glen to the situation, and Glen moved Plaintiff to a conference room to discuss the matter.   When Glen asked Plaintiff what had set him off, Plaintiff told Glen that Dixon threatened him by shadow boxing in his direction and that he felt threatened by Dixon's

9

actions.  Both Plaintiff and Dixon were immediately placed on paid administrative leave.  The following day, as the investigation continued, Plaintiff sent an e-mail to Sanchez who had not been present for the incident, claiming that he had concerns for his physical safety because Dixon allegedly lunged at him during the altercation and clenched his fist toward him as if to hit him.  However, it is undisputed that Plaintiff did not tell either Acosta or Glen on the evening of the incident (October 3rd) that Dixon allegedly lunged at him or clenched his fist toward him.  Also, Plaintiff's description of the incident was inconsistent with reports from all witnesses of the incident.  In addition, no threatening comments or behavior can be discerned from the audio recordings of the incident, which the Court has carefully reviewed.  On the recordings of the two customer calls, Plaintiff can be overheard by the customers saying, "You like throwing punches in the air? Do it again, come on, do it again! I'm fucking tired of you threatening me" and "That jerk wad is threatening me again. I'm fucking sick of it!"  Ex. C-20.

Plaintiff also sent an e-mail on October 4th to Dan Mead ("Mead"), Verizon's then-President and Chief Executive Officer ("CEO")[7], requesting assistance with the issues he was having with Dixon, claiming that his supervisors had covered up the harassment and that Lumb and Sanchez had not been able to stop the threats and intimidation.  Plaintiff's e-mail to Mead was eventually forwarded to Terri Decker ("Decker"), Human Resources Manager for the Albuquerque Call Center.  Ex. C (Decker Decl.), ¶¶2, 23.  On October 10,2013, Plaintiff sent an e-mail to Decker claiming that leadership was negligent in not taking any steps to observe Dixon and to document their observations regarding his conduct.  Doc. 44-2 (Ex. 53).

Decker began her investigation on October 8, 2013 by interviewing Plaintiff about what happened on the night of October 3rd, and had follow-up meetings with him on October 10 and

---

[7] The Court could not ascertain from the pleadings whether Dan Mead was CEO over all of Verizon's United States operations or CEO of a regional part of Verizon's operations.

14, 2013. Plaintiff told Decker that Dixon had a violent criminal background and suggested that he was not fit to work for Verizon.  Between October 8th and 14th, Decker interviewed Dixon, Biesterveld, Acosta, Lumb, Sanchez, Glen and seven other employees.  Decker also listened to the two audio recordings of customer calls from October 3rd.  Like Lumb and Sanchez, Decker was not able to substantiate any of Plaintiff's allegations against Dixon and Biesterveld. Employees whom Decker interviewed confirmed that Dixon had not anything to provoke Plaintiff's actions and that Plaintiff had initiated the interaction with Dixon after slamming down his headset at his workstation.  One of the employees told Decker that she did not ever want to work with Plaintiff again.  Decker closed out the investigation and reported her findings to her superiors.  Ex. A at 166:4-6; Ex. C at ¶ 27 and Ex. C-20.

Decker recommended Plaintiff's termination based on her reports and also because Plaintiff was already on a Final Written Warning when he got into the altercation with Dixon. Neither Lumb, Sanchez or Bisterveld were consulted about the termination, nor did any of them participate in the decision-making process; the final decision was ultimately made by Dan Finnegan, Executive Director of Human Resources at Verizon.  Plaintiff was terminated effective October 26, 2013 for violence/threats in the workplace.  Dixon was allowed to return to work and was told to cease shadow boxing as a show of celebration.

## DISCUSSION

The Court first addresses Plaintiff's FMLA claim, noting that its disposition leaves only state law claims remaining in the case.  Nevertheless, the Court will exercise supplemental jurisdiction over these claims under 28 U.S.C. §1367 in the interest of a speedy and final disposition to the state law claims, all of which the Court finds meritless.

**I.      FMLA Claim (Count VII)**

11

Retaliation claims under the FMLA, 29 U.S.C. §2601 et al, are subject to the burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003). Under this analysis, Plaintiff bears the initial burden of establishing a prima facie case of retaliation. *Id.* If Plaintiff does so, then Verizon must offer a legitimate, non-retaliatory reason for the employment action. If Defendant produces sufficient evidence to support a non-retaliatory explanation for its decision, Plaintiff then bears the ultimate burden of demonstrating that Defendant's proffered reasons were not its true reasons, but were a pretext for retaliation. *Id.*; *see also Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1263 (10th Cir. 1998) (explaining that plaintiff has the ultimate burden of demonstrating that the challenged employment decision was the result of intentional retaliation).

A.    Prima Facie Case

To establish a prima facie case under a retaliation theory, Plaintiff must show that (1) he engaged in a protected activity; (2) a reasonable employee would have found Verizon's action materially adverse; and (3) there is a causal connection between the protected activity and Verizon Wireless' adverse action. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006). The "critical inquiry" at this prima facie stage is "whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination." *Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1221 (10th Cir.2002) (quotations omitted); *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006).

Plaintiff meets the first two requirements: he engaged in a protected activity by taking FMLA leave and a reasonable employee would consider the termination decision to be a

materially adverse action.[8] The inquiry for this claim is whether Plaintiff can establish the third element of his prima facie case by linking his protected leave of absence to his termination. Defendant accurately observes that at his deposition, Plaintiff cited two reasons for his belief that taking FMLA leave resulted in his termination. First, Plaintiff stated that his supervisor, Christopher Bassett, seemed a "little bit focused" on the importance of getting the FMLA paperwork submitted properly and in timely fashion. Ex. A at 122:3-13. Plaintiff described Bassett's remarks as a warning that if he did not process the FMLA paperwork correctly, he could be terminated. *Id.* at 12:17-22. Second, Plaintiff felt that his taking leave was a factor in his termination because on the evening of the altercation with Dixon on October 3rd, he had relayed to Mitchell Glen that he had been out on short-term disability for stress. Plaintiff felt that the underlying reason for his leave was the motivation behind his termination. Ex. A at 176:1-11.[9]

Bassett's "continued overemphasis" on submitting FMLA paperwork correctly (*see* Ex. A at 176:16-23) cannot, by any stretch, be considered as conduct displaying discriminatory intent. On the contrary, Bassett's concern about getting the paperwork right so Plaintiff would *not* be terminated, reasonably infers just the opposite: concern that Plaintiff would not have any problems with taking his leave. Also, there is no evidence that Bassett participated in the decision to terminate Plaintiff's employment. Plaintiff's belief that his comments to Glen resulted in his termination is sheer speculation, particularly when Plaintiff concedes that Glen did

---

[8] Defendant correctly uses the definition of "adverse action" as set forth *Burlington Northern & Santa Fe Railway v. White,* 548 U.S. 53 (2006). The *Burlington* decision rejected the "adverse employment action standard" by holding that a Title VII retaliation claim plaintiff need only show "that a reasonable employee would have found the challenged action materially adverse." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.,* 452 F.2d 1193, 1202, n.2 (10th Cir. 2006)(quoting *Burlington,* 126 S.Ct. at 66-68). The *Burlington* standard has been extended to FMLA retaliation claims. *See Metzler,* 464 F.3d at 1171, n.2 (finding that *Burlington's* rejection of "adverse employment action" applies "with equal force in the context of an FMLA retaliation case" because the FMLA's retaliation clause "is derived from Title VII and is [thus] intended to be construed in the same manner").

[9] Glen's name is spelled as "Glenn" is some pleadings.

not comment to him in any way about the fact that he had taken FMLA leave.  Ex. A at 176:9-11.  Plaintiff acknowledges that neither Biesterveld nor Dixon made any rude or offensive remarks about him exercising his rights to take FMLA leave.  Ex. A at 118:10-13 and 21-24.  Plaintiff offers nothing else to support his FMLA retaliation claim.  He does not claim that any negative or derogatory remarks were made by anyone at Verizon about his applying for and taking a medical leave.

Plaintiff contends that there exists a causal connection based on a temporal proximity between his FMLA leave and his termination, since the recommendation for his termination occurred on October 11, 2013—less than two months after he returned from leave.  Close temporal proximity can establish a causal connection between the protected activity and the adverse action.  *See Candelaria v. EG&G Energy Measurement, Inc.,* 33 F.3d 1259, 1261 (10th Cir. 1994).  However, causal connection based on temporal proximity in this case is questionable at best.  Plaintiff is attempting to connect his termination with the simple *fact* of his leave, rather than with specific statements or conduct which infer or suggest retaliatory motive.  *See Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1320 (10th Cir. 1999) (plaintiff  may establish the causal connection by proffering "evidence of circumstances that justify an **inference of retaliatory motive**, such as protected conduct closely followed by adverse action") (emphasis added).  Neither Bassett's concern about Plaintiff completing his FMLA paperwork correctly, nor the fact that Plaintiff told Glen the reasons for taking FMLA leave, suggests that he had taken  suggest retaliatory motive on Glen's part.  Moreover, there is more than a three-month span between Bassett's comments to Plaintiff in July 2013 about FMLA paperwork, which is insufficient by itself to show causation.  *See Meiners v. Univ. of Kan*., 359 F.3d 1222, 1231 (10th Cir. 2004) (six-week period between protected activity and adverse action may be sufficient,

14

standing alone, to show causation, but a three-month period, standing alone, is insufficient).

Unless an adverse action is very closely connected in time to the protected activity, a plaintiff

must rely on additional evidence beyond mere temporal proximity to establish causation.  *Id.*

Plaintiff offers no such evidence of retaliatory motive.

      B.     <u>Shifting Burden Analysis: Legitimate Explanation and Pretext</u>

However, even if the Court assumes that Plaintiff established a prima facie case,

Plaintiff's FMLA claim ultimately fails.  Verizon has presented more than sufficient facts to

support a legitimate, non-retaliatory explanation for its decision. Plaintiff was terminated for

violating Verizon's workplace violence policy while he was on Final Warning.  Defendant's

workplace policy expressly stats that "[a]ny additional violations of the Code of Conduct . . .

may result in further disciplinary action up to and including termination of employment."  Ex. C

at ¶ 33; Ex. D at ¶ 9 and Ex. D-4.

In light of these legitimate reasons, in order to defeat summary judgment, Plaintiff must

show there is a genuine dispute of material fact as to whether or not Verizon Wireless'

explanation for terminating his employment is pretextual. Plaintiff can accomplish this by

presenting other factors that demonstrate weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in Verizon's proffered reasons for Plaintiff's termination such

that a "reasonable fact finder" would rationally find them unworthy of credence.  *Annett vs.*

*University of Kansas*, 371 F.3d 1233 (10th Cir. 2004); *see Campbell v. Gambro Healthcare, Inc.*,

478 F.3d 1282, 1290-91 (10th Cir. 2007) (to show pretext, plaintiff was required to "present

evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive") (emphasis in

original).

Plaintiff offers his subjective, unfounded belief that he was retaliated against because he took FMLA leave, but offers no genuine issues of fact concerning Defendant's motivation. Bassett and Glen's awareness of Plaintiff's FMLA leave does not constitute pretext because there is no evidence suggesting that Bassett or Glen were upset with him for taking leave or that they made any negative remarks about him exercising his right to take FMLA leave. Not having demonstrated any factual dispute suggesting pretext on the part of Defendant, Plaintiff cannot withstand summary judgment on this claim.

## II.   Race Discrimination Harassment Under the Human Rights Act (Count II)

The Human Rights Act makes it unlawful for "an employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of . . . race." NMSA § 28-1-7(A). Claims brought under the Human Rights Act are also subject to the *McDonnell-Douglas* shifting burden analysis. *See Smith v. FDC Corp*., 787 P.2d 433, 436-37 (N.M. 1990); *Orr vs. City of Albuquerque*, 417 F.3d 1144 (10th Cir. 2005) (because plaintiff's burden under the Human Rights Act is identical to the burden under a Title VII claim, analysis of the federal law applies equally to the state law claim) (citing *Cates v. Regents of the New Mexico Inst. of Mining & Tech*., 124 N.M. 633, 638 (1998).

### A.   Prima Facie Case

To set forth a prima facie case of race discrimination, Plaintiff must establish that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position at issue, and (4) he was treated less favorably than others not in the protected class. *See Sanchez v. Denver Pub. Sch*., 164 F.3d 527, 531 (10th Cir. 1998). Conduct

rises to the level of "adverse employment action" when it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Jaramillo v. Colo. Judicial Dep't.*, 427 F.3d 1303, 1306-07 (10th Cir. 2005). Acts which have a de minimis impact on an employee's future job opportunities are excluded from the definition of "adverse actions." *Aquilino v. Univ. of Kan.,* 268 F.3d 930, 935 (10th Cir. 2001). Also, mere inconveniences or alterations of job responsibilities do not constitute adverse employment actions. *Stover v. Martinez*, 382 F.3d 1064 (10th Cir. 2004). Under this circuit's precedent, then, only Plaintiff's termination and alleged failure to promote can be considered adverse actions and can proceed to the next part of the inquiry, which is whether Plaintiff was treated less favorably than others not in the protected class.[10] However, Plaintiff cannot show this. Since January 2011, only two other employees at the Albuquerque Call Center have been terminated for violence/threats, one of whom is Hispanic. (Ex. C at ¶ 35.) In the year preceding Plaintiff's termination, there were no other terminations for violence/threats but there were four other employees who were terminated for Code of Conduct violations related to conduct in the workplace. (Ex. C at ¶ 35.) Of those four, two are Hispanic and one is African-American. (Ex. C at ¶ 35). Therefore, Plaintiff has not established a prima facie case of race or ethnicity discrimination.

Plaintiff also claims that he was denied opportunities for advancement and promotion because he was Italian American. However, Defendant offers facts that say otherwise. Although

---

[10]   As Defendant correctly observes, neither Plaintiff's receipt of the Final Written Warning, nor his placement on paid administrative leave can be considered adverse actions. *Haynes v. Level 3 Commc'ns*, LLC, 456 F.3d 1215, 1224 (10th Cir. 2006) (holding a written warning is not an adverse employment action if it does not cause a significant change in employment status); *Benavides v. City of Okla. City*, 2013 U.S. App. LEXIS 1474, at *15 (10th Cir. Jan. 23, 2013) ("[plaintiff] did not suffer a materially adverse action by being placed on paid administrative leave"); *Gerald v. Locksley*, 785 F. Supp. 2d 1074, 1117 (D.N.M. 2011) (concluding that placing plaintiff on paid administrative leave was not an adverse employment action). Biesterveld allegedly calling Catapano by his last name is also not an adverse employment action, as it surely has de minimis consequences.

Plaintiff applied for approximately 23 positions after his February 27, 2011 promotion to Coordinator of Technical Support, 13 of those 23 positions were related to engineering, a field in which Plaintiff had no experience. Ex. C at ¶ 36.   Plaintiff presents no facts indicating that other employees not in his protected class of Italian American employees were treated more favorably. Plaintiff also claims that the positions to which he applied typically go to Hispanic employees (Ex. A at 79:17-81:23), but again the facts say otherwise.   Of the 23 people hired to fill those positions, over half of them are not Hispanic.   Ex. C at ¶ 36.   Just as he asserts with regard to his termination claim, Plaintiff's failure to promote claim is based on "just a feeling."   Ex. A at 79:17-80:3; Ex. C at ¶ 13 and Ex. C-8.   Speculation cannot is not a substitute for facts showing that a plaintiff was treated less favorably than others not in the protected class.

      B.     <u>Legitimate Explanation and Pretext</u>

Even assuming that Plaintiff was able to establish a prima facie case of race discrimination, Verizon can demonstrate that it had a legitimate, non-discriminatory reason for his termination.   Plaintiff was terminated for engaging in threatening behavior towards Dixon on October 3, 2014.   Ex. C at ¶33.   Moreover, he was on Final Written Warning when he engaged in that behavior, and had been advised that further behavioral issues would lead to his termination. Ex. A at 63:3-7; Ex. D-4.   Plaintiff does not offer any facts or evidence to dispute this, and there is no evidence in the record suggesting that Catapano's ethnic background as an Italian American had anything to do with Verizon's decision to terminate his employment.   Further, neither of the alleged harassers or discriminators (that is, Biesterveld and Dixon) participated in the decision-making process.

Notably, Plaintiff has not made any allegations of racist remarks either in the complaint or anywhere in the pleadings, nor has he identified any racist comments in any of his numerous

complaints to Human Resources or in his deposition testimony. In fact, Plaintiff confirmed at his deposition that neither Biesterveld nor Dixon made any rude or offensive remarks to him about his race. Ex. A at 118:1-6, 118:14-16. Plaintiff claims that Biesterveld mocked his Italian American ethnicity because she over-emphasized certain syllables in his last name, but this conduct does not create a causal link to Plaintiff's termination. *Cmp., Stone v. Autoliv Asp. Inc.,* 210 F.3d 1132 (10th Cir. 2000) (isolated comments unrelated to challenged action are insufficient to show discriminatory animus in termination decisions). Here, there is no reasonable inference to be made between Biesterveld's pronunciation of Plaintiff's name, and Verizon's decision to terminate Plaintiff. Other than his issue with Biesterveld, Plaintiff did not identify any racist comments made by any Verizon employee (Ex. A at 208:1-5), nor did he ever overhear any comment about race that led him to believe that his termination was racially motivated (Ex. A at 208:6-9).

In his response, Plaintiff offers no facts or evidence to suggest that Defendant's reasons for terminating him are pretextual; there is simply no connection between Plaintiff's race or ethnic background and his termination to be found anywhere. In the end, Plaintiff bases this claim entirely on his own subjective beliefs and speculation, which "carry no probative weight in summary judgment proceedings." *Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004); *see also Tapia v. City of Albuquerque,* 170 Fed.Appx. 529, 534 (10th Cir. 2006) (mere subjective belief of discrimination is insufficient to preclude the grant of summary judgment). Accordingly, Defendant is entitled to summary judgment on this claim.

## II.     Hostile Work Environment Based on Race (Count II, continued)[11]

---

[11]   Plaintiff alleged harassment in the complaint as part of his gender discrimination claim in Count III brought under the Human Rights Act. *See* Doc. 1-2, ¶¶75-87. However, Plaintiff has since withdrawn his claim for sex or gender discrimination. Doc. 44 at 1, n.1. It appears that Plaintiff has not withdrawn his claim for harassment that

Plaintiff's hostile work environment claim is premised on Dixon's allegedly threatening, aggressive and violent conduct.  Plaintiff contends that Defendant permitted Dixon's conduct and failed to meaningfully respond to his complaints.  Specifically, Plaintiff contends that Defendant failed to grant Plaintiff's request for a transfer to another team and instead kept Dixon in close proximity.  He became stressed out to a point where he had to go on short term disability and was diagnosed with Post Traumatic Stress Disorder ("PTSD") arising from this workplace conduct.

To survive summary judgment, Plaintiff must show that under the "totality of the circumstances": (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus. *Bolden v. PRC Inc*., 43 F.3d 545, 551 (10th Cir.1994) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986).  In evaluating the first prong of a hostile work environment claim, a courts considers all the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 23 (1993).

The complained-of conduct consists of Dixon glaring at Plaintiff and throwing air punches.  Dixon's former supervisor, Joe Acosta, confirmed during Lumb's February 2013 investigation that Dixon would punch the air in a celebratory manner. Ex. B at ¶ 9, Ex. E at ¶ 6. Acosta also noted that Dixon often got excited and that his behavior motivated the other employees on his team.  Ex. B at ¶ 9; Ex. E at ¶ 6.  Other than Plaintiff, no other individual at Verizon ever complained about Dixon punching the air or shadow boxing, and no one ever

---

was part of Count III, since Plaintiff has included the harassment claim in his response addressing Count II which alleges race discrimination, and Defendant has addressed the issue.

witnessed Dixon doing so towards Plaintiff in a threatening manner.  Ex. B at ¶ 9; Ex. E at ¶ 6. Plaintiff does not allege that Dixon struck or even touched him during his employment.  Ex. A at 34:14-18.  Plaintiff does not claim that Dixon made any threatening remarks to him, except for one instance when Dixon referred to Plaintiff as a "jerk" when Plaintiff refused to allow Dixon to listen in on customer calls at his workstation.  Ex. A at 34:19-21; 157:14-19.

Plaintiff's hostile environment claim fails for several reasons.  First, Plaintiff's allegations against Dixon are not connected to Plaintiff's race.  Second, notwithstanding Plaintiff's subjective belief that Dixon's behavior was racially motivated, this belief is insufficient to show a hostile work environment.  The environment must be found to be *both* subjectively and objectively hostile or abusive, and there is no reasonable way to view Dixon's behavior or conduct as being racially hostile or motivated. *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 23 (1993).  Third, isolated incidents and offhand comments, unless extremely serious, are filtered out from the category of hostile work environment. *MacKenzie vs. Denver, City and County of,* 414 F.3d 1266 (10th Cir. 2005) (hostile environment claim failed because allegations fell far short of severe and pervasive).  Considering the totality of circumstances, the Court finds that Plaintiff's allegations related to Dixon are unrelated to race in any way, certainly cannot be considered extremely serious, and did not occur with a frequency that could qualify as pervasive to make Plaintiff's working environment objectively hostile or abusive.  For these reasons, Defendant is entitled to summary judgment on this claim.

## III.    Retaliation Under the Human Rights Act (Count IV)

Under the New Mexico Human Rights Act, it is unlawful for an employer to "engage in any form of threats, reprisal or discrimination against any person who has opposed any unlawful discriminatory practice or has filed a complaint, testified or participated in any proceeding under

the Human Rights Act." N.M. Stat. Ann. § 28-1-7(I)(2). Plaintiff's retaliation complaints are asserted only against Biesterveld. Ex. A at 156:11-14).

A.     Prima Facie Case

To establish a prima facie case of retaliation under the Human Rights Act, a plaintiff must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two events. *See Ocana v. Am. Furniture Co.*, 91 P.3d 58, 72 (N.M. 2004) (citation omitted). As with Plaintiff's discrimination claim, where there is no direct evidence of retaliation, a retaliation claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004) (citations omitted). If Verizon offers such a reason for the action, the presumption is discarded and the burden returns to Plaintiff to show with sufficient evidence that the justification is pretextual.

Plaintiff's position is that this claim is supported by temporal proximity and causal connection between his protected activity (that is, his complaints about Dixon) and his termination. It is undisputed that Plaintiff first complained about Dixon to Biesterveld in January 2013. Thus, the time period between that protected activity and Plaintiff's termination is too long to create temporal proximity. *See Conner v. Schmuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (holding that four-month lag between protected activity and adverse action is not sufficient to justify inference of causation). Plaintiff contends that he sent other emails subsequent to his January 2013 complaint to Biesterveld which satisfies the temporal proximity requirement. For example, Plaintiff met with David Sanchez from Human Resources on August 20, 2013 (Doc. 44-2, Pltff's Resp.) and faxed Sanchez a letter on July 15, 2013 in which Plaintiff expressed the concern that he was issued the Final Written Warning both because he was not

Hispanic and because he complained of threats by Dixon (Pltff's Ex. 2 at 184:22-24).   At the August 20th meeting, Plaintiff complained Biesterveld came by his desk "taunting" him by calling out "Hey Mr. Catapano." and saying "Cat-ta-pano" "really slow."  Doc. 44-2.  The Court will assume that this meeting constitutes both protected activity and meets the temporal proximity requirement, but it will ultimately fail because as the Court next discusses, Plaintiff does not present any evidence of pretext.   Plaintiff also sent emails to Sanchez and Decker on October 4th and October 10th, respectively, charging the "leadership" at Verizon with "negligence" in failing to be proactive in preventing the altercation between him and Dixon. Pltff's Ex. 2 at 275:9-17; Pltff's Ex. 53.   Whether these October emails should be viewed as "protected activity" and although they are within close temporal proximity to Plaintiff's termination, they are useless in providing Plaintiff with any inference of retaliatory motive: Plaintiff's conduct on October 3rd was clearly the sole reason for which Plaintiff was terminated, and Plaintiff presents no facts or evidence to suggest otherwise.   Moreover, Plaintiff fails to present any evidence of causation between these complaints and Biesterveld's role in the decision to terminate him.   In fact, Biesterveld was not Plaintiff's supervisor at time of his termination. Ex. A at 28:10-18 *See Bullington v. United Air Lines,* 186 F.3d 1301 (10th Cir. 1999) (must have nexus between protected activity and adverse action).

Plaintiff describes the adverse employment action in this claim as his termination, but also mentions being placed on administrative leave and being disciplined without a substantial basis. Compl., ¶¶88-94.  Plaintiff would be unable to allege the issuance of the Final Written Warning as an adverse action because it occurred six months after Plaintiff first complained about Dixon.  Ex. D at ¶ 9 and Ex. D-4.  There is evidence of complaints to Biesterveld in early February, see Doc. 42-35 (Deft's Ex. 35), but this would also have occurred too far in time to

suggest temporal proximity.  Plaintiff also sent an e-mail to Lumb on March 18, 2013 advising her that the alleged threats by Dixon had stopped but he felt that Dixon "could become violent at any time."  Doc. 44-2 (Pltff's Ex. 35).  Even assuming this email to Lumb was protected activity, the time period between the email and the Final Written Warning is still more than three months. Moreover, Plaintiff could not rely on the Final Written Warning as adverse action because there is no evidence of any pretext in the issuance of the Final Written Warning.

Plaintiff cannot proceed past a prima facie case based on his placement on paid administrative leave, since this action is not an adverse employment action.  *See* note 9, supra.

B.  <u>Legitimate Explanation and Pretext</u>

Verizon has articulated the requisite legitimate, non-retaliatory reason for Plaintiff's termination.  As described above, Plaintiff was terminated for violating Verizon's workplace violence policy when he engaged in violent behavior and made threats to Dixon in the presence of his coworkers. Ex. C at ¶¶ 30, 33 and Ex. 20.  Prior to recommending Plaintiff's termination, Terri Decker conducted a very thorough investigation. Ex. C at ¶ 24-28 and Ex. C-22. This investigation confirmed that Plaintiff, who was on a Final Written Warning at the time, yelled at Dixon while assisting customers on the phone, slammed down his headset, pointed his finger in Dixon's face, and repeatedly told Dixon to "try it again." Ex. A at 166:4-6; Ex. C at ¶¶ 30, 33 and Exs. C-20 and C-22; Ex. E at ¶ 3 and Ex. E-1.

Other than his own subjective belief, Plaintiff offers no evidence to suggest that Biesterveld was a moving force behind his termination or that his termination was a result of any retaliatory motive on Biesterveld's part.  She was not consulted about the termination decision and did not participate in the decision-making process regarding termination. Ex. C (Decker Decl.) at ¶ 32.  Biesterveld was not Plaintiff's supervisor at the time, and Plaintiff himself

testified that he believed that Glenn made the decision to terminate his employment.  Ex. A at 205:8-18.  Plaintiff offers nothing to refute these facts, and has not attributed any negative statements to Biesterveld which would suggest that she was upset at him for complaining about either her or Dixon.  Accordingly, Defendant is entitled to summary judgment should be granted on Plaintiff's NMHRA retaliation claim.

## IV.    Breach of Implied Contract (Count V)

"In the absence of an express or implied contract providing otherwise, an employee is presumed to be an employee-at-will." *Kiedrowski v. Citizens Bank,* 893 P.2d 468, 471 (N.M. Ct. App. 1995) (citation omitted). "An implied contract may be found in written or oral representations, in the conduct of the parties, or in a combination of representations and conduct." *See Gormley v. Coca-Cola Enters.,* 85 P.3d 252, 258-59 (N.M. Ct. App. 2004) (citation omitted). "To support the existence of an implied contract, an oral representation must be sufficiently explicit and definite." *Id.* Further, "an employer's representations which give rise to a reasonable expectation that employees will be terminated only for good cause, may create an implied contract." *Kiedrowski,* 893 P.2d at 471.  If the representations are "sufficiently explicit," a jury may find that a contract is implied in fact to 'restrict' the absolute power of the employer to discharge at will. *Id.* (citation omitted).

Plaintiff concedes that he did not have a written employment contract with Verizon.  Ex. A at 120:11-20.  Instead, he contends that the company's Code of Conduct is an implied contract and leads employees to believe that they will not be discriminated or retaliated against, or harassed with any conduct or statement creating a hostile work environment.  While the Code of Conduct is obviously meant to govern employees' conduct, it is not reasonable to expect that its provisions regarding discrimination and harassment to guarantee an employee a safe, secure and

nonthreatening atmosphere such that where an employee finds the atmosphere less than safe, secure and nonthreatening, Verizon can be sued under a contract theory.  The Code's provisions cannot be read as sufficiently explicit to give rise to such an expectation.  *Hartbarger v. Paxton Co.*, 115 N.M. 665, 672 (1993) (to create an implied contract, the offer or promise must be sufficiently explicit to give rise to reasonable expectations).

The Code of Conduct has an express "at-will" statement and clearly disclaims that it creates any promise or contractual effect.  Doc. 42-10 (Ex. C at ¶ 6 and Ex. C-1 at p. 3, fn. 1). *See Montano v. Christmas by Krebs Corp.*, 293 Fed. Appx. 625, 628 (10th Cir. 2008) (affirming summary judgment for employer; failure to follow policy did not breach implied contract "in the face of the clear, unequivocal language stating that employment was at will").  The workplace violence and non-retaliation provisions in the Code of Conduct are the type of "non-promissory" policy statements that are insufficient to create contractual rights under New Mexico law. "General policy statements of a non-promissory nature contained in an employee handbook are insufficient to create an implied contract." *Gerald v. Locksley*, 785 F. Supp. 2d 1074, 1142-1145 (D.N.M. 2011) (dismissing breach of contract claim because whistleblower and anti-retaliation provisions were "non-promissory" and "merely a declaration of [the] defendant's general approach to the subject matter"); *Stieber v. Journal Publ'g Co.*, 901 P.2d 201, 205 (N.M. Ct. App. 1995) (affirming summary judgment for employer on claim that handbook created an implied contract not to discriminate against her).[12]  Thus, Plaintiff had no reasonable expectation

---

[12] *See also Clayton v. Vanguard Car Rental, U.S.A.,* Inc.,761 F.Supp.2d 1210, 1277 , 281-82 (D.N.M. 2010) (anti-discrimination policy in employee handbook that "strictly prohibited" harassment or discrimination constituted "mere declarations" of the employer and were "not sufficiently specific to create an implied contract"); *Daniels v. United Parcel Service, Inc*., 797 F.Supp.2d 1163, 1196–97 (D.Kan.2011) (finding implied contract claim barred because it was based on the same retaliation alleged under Title VII and other federal anti-discrimination statutes); *see also Hartnett v. Papa John's Pizza USA, Inc*., 912 F. Supp. 2d 1066, 1097 (D.N.M. 2012) (assuming employer failed to follow its written harassment policy, employee handbook read as a whole undermined any claim that employee reasonably understood her at-will status was impliedly altered by the policy).

that he would only be terminated for cause to support an implied contract claim, and summary judgment is appropriate on this claim as well.

## V.      Retaliatory Wrongful Discharge

New Mexico courts created the tort of wrongful discharge "as a means of redress for the very limited situation in which an employee has no other means of protection against an employer's breach of public policy." *Silva v. Albuquerque Assembly & Distrib. Warehouse Corp.,* 106 N.M. 19 (1987) (*"Silva I").* Defendant contends that the claim of retaliatory discharge is unavailable to Plaintiff because he already has legal recourse under the Human Rights Act, relying on *Salazar v. Furr's, Inc.,* 629 F.Supp.1403, 1409 (D.N.M. 1986) ("If the employee already has some protection, either because of an employment contract or through another cause of action, the tort is unnecessary and will not be recognized"). Defendant argues that Plaintiff is foreclosed from asserting a retaliatory discharge claim because the alleged fact pattern is identical to the remedial scheme in the Human Rights Act. However, the Court finds that this argument is not consistent with current New Mexico law that has been decided since *Salazar*.

In *Gandy v. Wal-Mart Stores, Inc.,* 117 N.M. 441 (1994), the New Mexico Supreme Court noted that the overlapping of remedies between the tort of retaliatory discharge and the statutory scheme in the Human Rights Act did not bar the tort claim, unless it was clear from the statutory language and the completeness of the "remedial mechanisms" that it was meant to be exclusive. 117 N.M. at 444 (citing *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 425 (1987)). Then, in *Silva v. American Federation of State, County and Municipal Employees et al.,* 131 N.M. 364 (2001) (*"Silva II")*, the New Mexico Supreme Court revisited the issue again, answering on certification from the Tenth Circuit several questions

27

relating to the tort of retaliatory discharge.  In *Silva II,* the Supreme Court rejected defendant's argument that the tort of retaliatory discharge should not be available to the employee because its protection was unnecessary and held that the employee had a remedy under the Human Rights Act," notwithstanding the fact that the Human Rights Act contains its own remedial scheme." *Id.* at 367.  Considering past New Mexico law on the subject, including *Gandy,* the Supreme Court clarified that a plaintiff who was *not* at-will could not pursue an action for the tort of retaliatory discharge under the public policy exception to at-will employment.  *Id.*  In other words, *Gandy* did not expand a retaliatory discharge claim to make it available to employees who were not at-will, but its principles, and those enunciated in *Silva I,* were still available to at-will employees. Of course, while a plaintiff may pursue causes of action under both the Human Rights Act and retaliatory discharge, he would not be able to recover twice for the same harm, that is, once under the statute and again under the tort.  *See Gandy*, 117 N.M. 441, 443 (N.M. 1994); *Silva v. American Federation of State, County and Municipal Employees et al*., 131 N.M. 364 (2001) (at-will employee could pursue claims under retaliatory discharge as well as the Human Rights Act, but employee was precluded from award of damages under both schemes).[13]

The Court notes that Defendant also relies on *McDonald v. Corrections Corp. of America*, 181 F.Supp.2d 1274 (D.N.M., 2002) for the proposition that Plaintiff cannot pursue a retaliatory discharge claim.  In *McDonald*, the district court found plaintiff's retaliatory discharge claim to be indistinguishable from her Title VII retaliation claim, and dismissed the retaliatory discharge claim, holding that the alleged public policy violation "must be vindicated under the terms of the federal statute."  Id. at 1283.  However, the analysis in *McDonald* looked

---

[13]  Plaintiff does not weigh in on the question of whether he is precluded from pursing both a claim under the Human Rights Act and retaliatory discharge.  Defendant resorts to its arguments pertaining to Plaintiff's other claims should the Court determine that Plaintiff may pursue a retaliatory discharge claim.  Doc. 42 at 27.

to other federal district court cases or New Mexico case law preceding *Gandy* and *Silva II* and so the Court does not consider *McDonald* to be dispositive here.

The Court is persuaded that the current state of New Mexico law allows Plaintiff, as an at-will employee, to pursue a claim for retaliatory discharge, but Plaintiff's victory on this point is short-lived because this claim suffers the same fate as his other claims. The question is whether Plaintiff has presented any facts to suggest that he was terminated because of his complaints to Biesterveld, Decker, Sanchez and Glen, and whether his complaints constituted a motivating factor in the decision to terminate him. *See* N.M. UJI-13-2304 (Retaliatory Discharge). For claims of retaliatory discharge, a motivating factor is a factor that plays a role in the decision to discharge. It need not be the only reason, nor the last nor latest reason, for the discharge. *Id.*

The Court's analysis on Plaintiff's other claims which call for a showing of illegal or retaliatory motive applies here as well. Plaintiff has brought forward no evidence to advance this claim past the summary judgment stage. Rather, the overwhelming evidence supports the finding that Plaintiff was terminated based on consequences stemming from his own workplace conduct. Because there are no facts which would suggest to a reasonable fact finder that Plaintiff was terminated as a result of his complaints either about Dixon or Biesterveld, this claim cannot survive. *See Sanchez v. The New Mexican,* 106 N.M. 76 (1987) (A retaliatory discharge claim includes a causation element); *Vigil v. Arzola,* 102 N.M. 682 (Ct.App. 1983) ("A sufficient nexus must exist between the public policy asserted by the employee and the reasons for his or her discharge), *reversed on other grounds*, 101 N.M. 687, 687 P.2d 1038 (1984), *overruled on other grounds*, *Chavez v. Manville Prods. Corp*., 108 N.M. 643, 777 P.2d 371 (1989). Therefore, this claim is also subject to summary judgment.

## VI.    Assault

New Mexico courts have acknowledged that "the elements of civil and criminal assault and battery are essentially identical." *New Mexico v. Ortega*, 113 N.M. 437 (N.M. Ct. App. 1992). A tortfeasor is liable for battery if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results." Id. (quoting Restatement (Second) of Torts § 18(1)(a)-(b)). See N.M. Stat. Ann. § 30-3-4 ("Battery is the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner."). New Mexico law defines assault as "an attempt to commit a battery" or "any unlawful act, threat, or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery." N.M. Stat. Ann. § 30-3-1.

Plaintiff does not allege that Dixon struck or even touched him during his employment. Ex. A at 34:14-18.  Plaintiff also acknowledges that Dixon never made any rude or offensive remarks to him about his race, gender, or the fact that he took a medical leave of absence. Instead, he claims that Dixon assaulted him by his body language, which he interpreted as nonverbal threats:

> [Dixon] would deliberately stand up and walk over to my workstation, stand in front of me. . . using confrontational body language and posture.  He would glare at me for long periods of time.  He would throw punches aggressively at my direction mimicking hitting me.  He would jump and down like a boxer in a ring, preparing for a boxing match, move his arms, mimicking his arms like a boxer, then glare at me for maybe 10, 15 seconds, and throw very aggressive punches in the air in very close proximity to me.

Ex. A at 36:23-25; 37:1-12.  Plaintiff stated that he perceived Dixon's conduct as a threat to his personal safety, even though during these times, which Plaintiff claimed occurred almost daily, neither Plaintiff nor Dixon said anything to each other.  *Id.*

Verizon supervisors investigated these incidents.  Acosta confirmed that Dixon would punch the air in a celebratory manner when he was on his team.  Dixon would often get excited in that manner, and this behavior would have the result of firing up the other employees on his team. Ex. B at ¶ 9; Ex. E at ¶ 6.  None of the facts support an assault claim.  Apart from Plaintiff, no one at Verizon ever complained about Dixon punching the air or shadow boxing, and no one witnessed Dixon doing so towards Plaintiff in a threatening manner.  *Id.*  There is no evidence suggesting that Dixon acted with intent to harm Plaintiff or to place him in imminent apprehension of such a contact, and no reasonable fact finder would conclude that Plaintiff was reasonable in his belief that he was in danger of receiving an immediate battery.[14]

Even if there were any material factual issues on an assault claim by Dixon, there is certainly no basis for a vicarious liability claim against Defendant.  An employer may be liable under the doctrine of respondeat superior for an intentional tort committed by its employee if the wrongful acts are committed in the course and scope of his or her employment." *Los Ranchitos v. Tierra Grande, Inc.*, 116 N.M. 222 (N.M. Ct. App. 1993) (citation omitted).  As a general rule, an employee's act is only within the course and scope of employment if:

> (1) it was something fairly and naturally incidental to the employer's business
> assigned to the employee, and (2) it was done while the employee was engaged in
> the employer's business with the view of furthering the employer's interest and did
> not arise entirely from some external, independent, and personal motive on the part
> of the employee.

*Los Ranchitos*, 116 N.M. at 223; UJI 13-407 NMRA.  Conversely, an intentional tort committed by an employee outside of the course and scope of the employee's employment cannot create liability for the employer. Los Ranchitos, 116 N.M. at 223 (noting seven cases in New Mexico and five other jurisdictions that were in accord).  Whether an employee's actions come within the

---

[14] Plaintiff's response on this claim fails to offer a cogent argument.  *See* Doc. 44 at 26.  Plaintiff instead relies on a hostile environment theory, which the Court has already found to be without merit.

scope of employment is generally a question of fact to be determined on a case-by-case basis. *Id.* However, the question is also appropriate for summary judgment disposition, where it is Plaintiff's burden to raise a factual dispute. Plaintiff has not done so here. There is no reasonable way to view as an attempt by Dixon to assault Plaintiff (assuming this is what happened) as conduct that was part of furthering Verizon's business interest. Further, any alleged discriminatory motive on Dixon's part (for which no evidence has been presented) would constitute Dixon's personal motive which is outside the course and scope of his employment at Verizon. Therefore, Defendant is entitled to summary judgment on this claim.

**VII.   Negligent Hiring, Retention and Supervision**

Plaintiff rests this claim on the fact that Verizon was aware of his reports that Dixon posed a threat to his safety and was violent. He alleges that Dixon had a prior history of armed robbery and domestic violence and that Defendant was negligent in hiring, supervising and retaining Dixon.

Theoretically, Verizon may be held liable in tort for negligent hiring, negligent supervision, or negligent retention of an employee even though it is not responsible for the wrongful acts of the employee under the doctrine of respondeat superior. *Los Ranchitos v. Tierra Grande, Inc.*, 116 N.M. at 228 (N.M.App.,1993) (citing *Pittard v. Four Seasons Motor Inn, Inc.,* 101 N.M. 723, 729, 688 P.2d 333, 339 (Ct.App.) (negligent hiring and retention constitutes alternative theory of liability against employer for employee's assault outside scope of employment), *cert. quashed,* 101 N.M. 555, 685 P.2d 963 (1984)). To establish the claim of negligence in hiring, supervising, and retaining an employee, Plaintiff must show that Verizon knew or reasonably should have known that some harm might be caused by Dixon's conduct. *Ocana v. American Furniture Co*., 135 N.M. 539 (N.M. 2004), cited in *Chavez v. Thomas &*

*Betts Corp.,* 396 F.3d 1088 (10th Cir. 2005), *overruling on other grds.* by *Law Co., Inc., v. Mohawk Const. and Supply co.,* 577 F.3d 1164, 1170 910th Cir. 2009).

Plaintiff acknowledges that Verizon obtains a background report on its prospective hires and also requires these individuals to submit to a drug test.  Ex. A at 109:23-110:4.  Verizon obtained a background report on Dixon before Dixon was hired in February of 2011.  Ex. C at ¶ 28; Ex. C-21.  Other than a DWI offense, the report did not list any of the violent charges which Plaintiff claims Dixon was charged with prior to his employment with Verizon.  There is no indication that Plaintiff's claims about Dixon are true, and even if they are, there is no evidence that Verizon was on notice of any such criminal history at the time of Dixon's hire.  Ex. C at ¶28 and Ex. C-21.

As with his other claims, Plaintiff offers no facts to support a negligent hiring and retention claim.  There is no evidence that Dixon harmed Plaintiff during his employment.  Other than referring to Plaintiff as "jerk," Plaintiff concedes that Dixon never touched him during his employment or made an allegedly negative remark to him.  Ex. A at 34:14-18; 34:25-36:5; 157:14-19.  Plaintiff also acknowledges that Dixon never tried to contact him outside of work. Ex. A at 107:16-23.  Neither can Plaintiff establish even a bare-bones negligent supervision claim.  The record shows that Plaintiff's complaints about Dixon were acted upon promptly by Biesterveld and by Human Resources personnel.  Summary judgment is proper for this claim as well.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment **(Doc. 42)** is granted for reasons described in this Memorandum Opinion and Order, in that Defendant is entitled to summary judgment on all of Plaintiff's claims.

A separate Judgment will be entered.

_____
UNITED STATES DISTRICT JUDGE